IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

---

KELLYE STRICKLAND,

  Plaintiff,

RECEIVED BY MAIL

JUL 2 8 2025

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

v.

                    Civil Action No. 0:25-cv-02056-DWF-DJF

RAMSEY COUNTY, a local government entity;

BARNA, GUZY & STEFFEN, LTD., a Minnesota professional corporation;

Referee ELIZABETH CLYSDALE, in her individual capacity;

Referee JENESE LARMOUTH (Doe 1), in her individual capacity;

Referee REBECCA ROSSOW (Doe 2), in her individual capacity;

Referee VICTORIA ELSMORE (Doe 3), in her individual capacity;

NICOLE RUEGER, in her individual and official capacities;

Deputy CORINA LOYA, in her official capacity only;

KYLE MANDERFELD (Doe 4), in his individual capacity only;

JOHN AND JANE DOES 5–10, in their individual capacities,

  Defendants.

---

**AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, COMPENSATORY AND PUNITIVE DAMAGES**

**COMPENSATORY AND PUNITIVE DAMAGES**

**JURY TRIAL DEMANDED**

1

SCANNED
JUL 2 8 2025
U.S. DISTRICT COURT MPLS

## I. INTRODUCTION

Since the filing of the original complaint on May 9, 2025, Plaintiff has identified and named multiple Doe defendants and refined the caption to reflect proper parties. Newly identified defendants include:

**(1) Referee Jenese Larmouth.** who presided over a contested hearing on May 23, 2025, despite administrative entanglement and the pendency of this federal action;

**(2) Referee Rebecca Rossow,** who presided over prior proceedings in which Plaintiff was denied notice and opportunity to be heard;

**(3) Referee Victoria Elsmore,** involved in access suppression and procedural irregularities;

**(4) Attorney Kyle Manderfeld,** who appeared as opposing counsel on May 12, 2025 while employed by a private law firm, and failed to disclose his prior role as a Ramsey County prosecutor during the period of Plaintiff's alleged harm; and

**(5) Barna, Guzy & Steffen, Ltd. (BGS),** the private Minnesota law firm that employed Manderfeld. ratified his conduct, and refused to conduct a conflict-of-interest check despite formal notice provided to fourteen attorneys, including firm partners.

Plaintiff has also clarified that Ramsey County is the proper municipal defendant for purposes of Monell liability, and has removed the Ramsey County Sheriff's Office, Bridges to Safety, and Donald Harper as named parties. These entities and individuals are either not subject to direct suit under governing precedent or do not appear to have exercised independent discretionary authority sufficient to support individual liability. Their roles and conduct remain relevant, however, and are addressed as part of the broader institutional pattern of abuse alleged against Ramsey County under Monell v. Department of Social Services. 436 U.S. 658 (1978).

Additional documentation obtained since the original filing—including post-litigation disclosures and internal correspondence—further supports Plaintiff's claims of document alteration, procedural obstruction, retaliatory coordination, and disability-based misconduct.

Plaintiff is autistic and permanently disabled, with documented impairments affecting executive function, information processing, and verbal communication. After being denied reasonable accommodations and meaningful access to court systems by Ramsey County personnel, Plaintiff relied on assistive digital tools—including generative AI—to organize legal arguments, verify procedural rules, and draft filings with clarity and structural precision. The use of AI-supported drafting was not elective, but a direct adaptation to the accessibility barriers imposed by Defendants' refusal to accommodate Plaintiff's disability. This Complaint was constructed in part through those tools as a form of self-accommodation. Plaintiff asserts that such use—particularly by autistic or cognitively disabled individuals—should be recognized as a valid form of accessibility support under federal law.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as the claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the Americans with Disabilities Act (42 U.S.C. § 12132), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), as those claims arise from a common nucleus of operative fact and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b), as all events or omissions giving rise to Plaintiff's claims occurred in Ramsey County, Minnesota, which lies within this judicial district.

## III. PARTIES

**Plaintiff Kellye Strickland** is a permanently and totally disabled adult residing in Tempe, Arizona. She receives Social Security Disability Insurance (SSDI) and qualifies as a protected individual under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Plaintiff brings this action in both her personal capacity and in the public interest, seeking to enforce her individual rights and clarify the legal protections afforded to self-represented, disabled litigants who engage in constitutionally protected oversight, whistleblowing, and accountability efforts within the judicial system.

Plaintiff maintains a public legal archive documenting procedural irregularities and systemic misconduct in Ramsey County courts. She has submitted good-faith reports to internal oversight bodies, court administrators, and federal agencies, and has been met with escalating obstruction, retaliation, and reputational harm. This action asserts that such lawful oversight activity is protected under the First and Fourteenth Amendments, the ADA, and related federal statutes.

**Defendant Ramsey County** is a political subdivision of the State of Minnesota responsible for the policies, training, and supervision of its judicial administration, ADA compliance framework, and law enforcement agencies. Ramsey County is sued under 42 U.S.C. § 1983, Title II of the ADA (42 U.S.C. § 12132), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) for maintaining customs,

4

practices, and omissions that caused systemic violations of Plaintiff's constitutional and statutory rights. All official capacity claims against Ramsey County employees are asserted through this municipal defendant pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

**Defendant Barna, Guzy & Steffen, Ltd. (BGS)** is a private law firm headquartered in Minnesota. BGS is sued under 42 U.S.C. § 1983 for acting under color of law by ratifying and perpetuating unconstitutional conduct through its employee, Kyle Manderfeld, after receiving formal notice of conflict, falsified service, and retaliatory litigation posture. BGS knowingly enabled a pattern of ADA retaliation, due process obstruction, and civil rights conspiracy following Plaintiff's protected federal filing.

**Defendant Referee Elizabeth Clysdale** is a judicial officer within the Minnesota Second Judicial District. She is sued in her individual capacity for issuing and enforcing a Harassment Restraining Order against Plaintiff without jurisdiction or valid service, in violation of Plaintiff's rights under the Due Process Clause, the ADA, and Section 504.

**Defendant Referee Jenese Larmouth (Doe 1)** is a judicial officer who presided over a contested hearing on May 23, 2025, despite the pendency of this federal action and unresolved accommodation requests. She is sued in her individual capacity for sustaining known ADA failures and contributing to post-filing procedural harm.

**Defendant Referee Rebecca Rossow (Doe 2)** is a judicial officer sued in her individual capacity for her role in Plaintiff's exclusion from notice, hearings, and procedural participation during earlier proceedings.

---

**Defendant Referee Victoria Elsmore (Doe 3)** is a judicial officer sued in her individual capacity for her involvement in suppressing records, denying ADA accommodations, and continuing proceedings without jurisdiction or notice.

---

**Defendant Nicole Rueger** is a Judicial Court Operations Supervisor. She is sued in her individual and official capacities for obstructing Plaintiff's access to filings, interfering with procedural rights, retaliating against disability-related communications, and contributing to systemic due process and ADA violations.

---

**Defendant Deputy Corina Loya** is a law enforcement officer employed by the Ramsey County Sheriff's Office. She is sued in her official capacity only for misrepresenting material facts in a February 2025 report, failing to disclose the existence of the HRO to Plaintiff, and unlawfully disclosing Plaintiff's protected address to a known retaliatory actor. Plaintiff seeks only injunctive and policy-corrective relief as to this Defendant.

---

**Defendant Kyle Manderfeld (Doe 4)** is an attorney employed by Barna, Guzy & Steffen, Ltd., and formerly employed by the Ramsey County Attorney's Office. He is sued in his individual capacity for entering the HRO case on May 12, 2025—three days after Plaintiff filed this federal action—without

6

disclosing his prior County affiliation, and for knowingly facilitating post-filing retaliation, ADA obstruction, and denial of procedural rights in coordination with Ramsey County personnel.

---

**Defendants John and Jane Does 5–10** are unidentified employees or agents of the Minnesota Second Judicial District and/or the Ramsey County Sheriff's Office. These individuals are sued in their individual capacities for participating in, enabling, or failing to prevent the constitutional and statutory violations described herein. Alleged conduct includes interference with filings, denial of accommodations, improper ex parte communication, and the processing of altered court documents. Plaintiff will amend this Complaint to identify these individuals as their names become known through discovery.

## IV. FACTUAL BACKGROUND

### IV: 1. ORIGINS OF THE CONFLICT

**On July 31, 2024,** Madeline Sally Lee submitted her first petition for a Harassment Restraining Order (HRO) against Plaintiff. The petition was denied the same day with an order stating that it failed to allege any conduct that would constitute a violation. The denial also confirmed that neither petitioner nor respondent qualified for a fee waiver. (See Exhibit A1)

**On August 8, 2024,** Lee submitted a second HRO petition, repeating the same statement of facts. It was again denied for failure to allege qualifying acts and for insufficient financial documentation; the court noted that submission of a benefits card alone was not adequate proof for a waiver. (See Exhibit A2)

**On August 9, 2024,** Lee submitted a third petition, once again with the identical statement of facts. The court initially denied the petition for the same reasons as before. However, minutes later, a second order

was generated, this time stating that the petition was not frivolous and that Lee's fee waiver was granted. (See Exhibit B5)

This abrupt reversal—without amended facts or new legal grounds—raises serious concerns about inconsistent judicial processing and undisclosed administrative intervention.

**On August 12, 2024,** Plaintiff placed an 11-minute phone call to Ramsey County Court and was transferred to Child Protective Services (CPS) to report serious concerns about Lee's conduct involving her minor child. The report was made under Plaintiff's legal name and phone number.

**On August 16, 2024,** Lee filed a third amended petition, again repeating the same statements of fact. That same day, the court issued a new order denying her ex parte request, explaining that a hearing had already been scheduled and instructing Lee that she could not file further amendments without express court approval. (See Exhibit A4)

That same day Lee filed a fourth amended petition. (See Exhibit A5)

**On August 17, 2024,** Plaintiff received unsolicited, harassing messages from unknown men accusing her of having a "mental breakdown." One of the senders was later identified as Dino Di Lucido, a former internet acquaintance from Plaintiff's time as a verified Meta content creator. These messages coincided with the escalation of Lee's filings and reflect an effort to provoke or discredit Plaintiff through third-party coordination.

Also **on August 17,** Plaintiff issued a cease and desist letter to Lee. Out of fear for her physical safety and in light of Lee's known doxxing and stalking behavior, Plaintiff used a non-residential address in the letter to shield her actual location.

Throughout her filings, Lee repeatedly included demonstrably false statements. For example, she alleged that Plaintiff had made Child Protective Services (CPS) reports against her on June 10 and July 3, 2024. These claims are provably false. As stated in Plaintiff's original federal complaint and

8

confirmed by call logs and case records. Plaintiff's first and only contact with CPS occurred on August 12, 2024.

Furthermore, Lee's own mother, Donnell Marie Lee, is quoted in the official February 3, 2025 incident report authored by Deputy Corina Loya as stating her belief that the harassment Lee was experiencing originated from individuals in India—not from Plaintiff. This admission further undermines Lee's narrative and reveals contradictory claims within her own supporting evidence.

Lee's petitions also relied on vague hearsay from unreachable "acquaintances," alleging that Plaintiff was harassing her and making unverifiable "threats". Plaintiff now understands that these accusations were part of a calculated effort to abuse judicial process by reframing a legitimate safety report as harassment—thus leveraging court power to suppress oversight and retaliate against Plaintiff for exercising constitutionally protected speech.

The resulting harm to Plaintiff's personal and professional reputation, safety, and legal position forms a central pillar of the due process, retaliation, and defamation claims asserted herein.

## IV: 2. UNLAWFUL SERVICE AND HEARINGS WITHOUT NOTICE

**On August 29, 2024,** Deputy Kaitlyn Burt of the Merrimack County Sheriff's Office contacted Plaintiff by phone regarding an attempted service initiated by Madeline Lee. Deputy Burt relayed that Lee had alleged harassment and threats, but did not mention an active Harassment Restraining Order or identify the call as a service attempt. Plaintiff informed Deputy Burt that she had not lived in New Hampshire for over five years and currently resided in Arizona.

Deputy Burt subsequently filed an Affidavit of Non Est, confirming that personal service could not be effectuated and that Plaintiff was not present within the jurisdiction. (See Exhibit D1)

9

**On October 2, 2024,** the Maricopa County Sheriff's Office in Arizona (Deputy Russ Skinner) filed a second affidavit confirming that service was again unsuccessful. (See Exhibit D2)

**On October 3, 2024,** the Ramsey County District Court issued a continuance order stating that further proceedings would be delayed to allow for a new attempt at personal service at the respondent's updated address. This acknowledgment in the court record affirms that as of that date, no valid legal service had been accomplished and that jurisdiction had not yet been established. (See Exhibit E2)

**On November 7, 2024,** petitioner Madeline Lee submitted an affidavit and request for publication, falsely stating that Plaintiff was intentionally evading service and that the documents had been mailed to Plaintiff's "last known address." That same day, the court issued an order permitting service by first-class mail to those same known invalid addresses, despite previously documented failures and returned mail. (See Exhibit F1)

**Also on November 7, 2025,** the court issued an **order for service by publication**, stating that "service shall be by first-class mail" to addresses previously identified as invalid. These addresses had already been rejected by law enforcement through sworn affidavits of non-service, confirming that Plaintiff did not reside at those locations and that mailings to those addresses had been returned as undeliverable.

Despite this, the court knowingly authorized substitute service to nonviable addresses—contravening procedural standards and due process protections that require notice to be "reasonably calculated" to apprise the party of the action.

**On November 8, 2024,** the court issued another continuance, stating that the matter was being continued "to allow the respondent time to be served by first-class mail." However, both mailings were later returned as undeliverable. (See Exhibit E4)

**On December 12, 2024,** Defendant Referee Elizabeth Clysdale granted a Harassment Restraining Order (HRO) against Plaintiff Kellye Strickland without her knowledge, participation, or valid legal

10

service. The order was issued without a district judge's signature and relied entirely on false presumptions of proper service—despite four documented service failures, three prior continuance orders acknowledging those failures, and knowingly invalid service by first-class and certified mail to addresses the court had already seen returned as undeliverable. The petitioner, Madeline Lee, had also submitted incorrect identifying information for Plaintiff, including a phone number off by one digit and an outdated address sourced from online public records dating back to Plaintiff's minor status. One of the listed addresses had previously been used by Plaintiff in a cease and desist letter, in which she intentionally concealed her real location for safety. (See Exhibit G)

The continued advancement of the case under these conditions—despite clear evidence of failed service, incorrect contact information, and administrative awareness of both—constitutes a sustained pattern of due process violations. These actions form a central component of Plaintiff's Fourteenth Amendment claim.

Despite four documented service failures—(1) a non est return by the Merrimack County Sheriff's Office in New Hampshire dated August 29, 2024; (2) a second affidavit of non-service by the Maricopa County Sheriff's Office in Arizona dated October 2, 2024; (3) a first-class mailing returned undelivered on November 12, 2024; and (4) a certified mailing returned undelivered on December 3, 2024—the Ramsey County court proceeded with a default hearing and granted the Harassment Restraining Order. Each of these documents was submitted under oath by law enforcement personnel in two different states and unambiguously confirms that Plaintiff was never served prior to the hearing. Proceeding under these conditions not only violated state procedural rules but also deprived Plaintiff of her federal constitutional right to notice and an opportunity to be heard. (See Exhibit D1-D4)

**On February 3, 2025,** Deputy Corina Loya of the Ramsey County Sheriff's Office contacted Plaintiff by phone. Loya was calling in response to a report made by Madeline Lee, who alleged that Plaintiff had sent death threats to her mother. The police report referenced a prior report in which Lee had also

attempted to report Plaintiff. The police interest was triggered in part by Lee voluntarily showing officers a cease-and-desist notice that Plaintiff had previously sent to her, which officers reportedly found suspicious. During the call, Deputy Loya failed to inform Plaintiff that a Harassment Restraining Order (HRO) had already been granted against her. Instead, Loya vaguely inquired about Plaintiff's location and requested her residential address under ambiguous pretenses. Believing the inquiry to be administrative and unrelated to any active legal proceeding, Plaintiff provided her real address in good faith. (See Exhibit H)

Deputy Corina Loya's own incident report from that period documented multiple irregularities in the handling of the Harassment Restraining Order (HRO) and the underlying records. Plaintiff's date of birth was listed incorrectly, the contact number on file was invalid, and the form templates used by the court referenced outdated revision codes from 2021—despite the order being issued in late 2024. Loya also explicitly recorded Plaintiff's emotional distress during the phone call and noted, "It's possible STRICKLAND is the victim."

Despite this, Loya's report falsely claimed that she had advised Plaintiff to contact the court. No such instruction was given. At no point during the February 3 phone call was Plaintiff made aware that an order had already been issued against her.

**On February 4, 2025,** Plaintiff called Bridges to Safety at the direction of Deputy John Gleason, who informed her that she might be a victim and should consider speaking with a victim advocate. A woman answered the phone and identified herself as "Nikki." When Plaintiff gave her name, Nikki responded that she was familiar with Plaintiff. Throughout the call, Nikki was openly hostile and dismissive. When Plaintiff asked why she was being treated with such hostility and requested to speak with someone else, Nikki placed her on hold but never transferred the call. Plaintiff called back a few minutes later, at which point Nikki answered again and asked, in a rude and sarcastic tone, "Do you wanna talk to my manager?" Plaintiff, shaken by the interaction, hung up.

12

**On February 27, 2025,** Plaintiff was formally served at the address given to Deputy Loya by Deputy David Sheets of the Maricopa County Sheriff's Office. (See Exhibit I)

Following the service, Plaintiff called Loya for clarification. Loya gave no meaningful explanation, merely stating that Plaintiff should "read the order and get a lawyer." It was during that call that Plaintiff, reading the documents for the first time, discovered that the HRO had been granted on December 12, 2024—more than two months prior.

This discovery marked a turning point in Plaintiff's understanding. What had previously felt like administrative confusion was now unmistakably the result of procedural concealment. Plaintiff realized that her due process rights had not only been violated, but actively subverted by coordinated omissions and misinformation.

**On March 3, 2025,** Petitioner Madeline Lee sent harassing mail directly to Plaintiff's husband, SkandaVishnu Sundar, at their shared residence in Arizona. The envelope was delivered via third party Sumit Sinha, named by the Petitioner under oath, and included materials suggesting retaliation and continued surveillance. The delivery confirmed that Plaintiff's private residential address—previously known only to court officials—had been disclosed to Lee by someone within the Ramsey County system. (See Exhibit U1)

**On March 4, 2025,** similar mail was sent to Sundar's place of employment, escalating the perceived threat and confirming that personal and professional information had been disseminated without consent. (See Exhibit U2)

### IV: 3. PLAINTIFF'S ATTEMPTS TO ASSERT RIGHTS

**On March 6, 2025**—nine days after formal service of the Harassment Restraining Order—Plaintiff filed a Motion to Rescind. The motion was timely under Minn. Stat. § 609.748, which allows a respondent to request a hearing within 20 days of completed service. (See Exhibit M1)

13

Although the court cited Minn. Stat. § 609.748, it did not clarify whether the 20-day window was calculated from the November mailing, the December 12 HRO issuance, or the February 26 formal service—none of which, except the latter, constitute valid service under Minnesota law. Most notably, Plaintiff was not made aware of the existence of the November 7 notice of alternate service until July 9, 2025, when it was included in a post hoc court document production. The notice was never served, disclosed, or otherwise communicated to Plaintiff prior to that date. As such, the court's reliance on that document as a basis to deny Plaintiff her statutory right to a hearing—while withholding the document itself—constitutes a clear and knowing violation of procedural due process.

Also **on March 6, 2025,** Plaintiff filed two separate actions in Ramsey County District Court: a small claims complaint against Madeline Lee for defamation and harassment, and a petition for a Harassment Restraining Order (HRO) seeking protection from ongoing misconduct. Both filings were accepted, time-stamped, and accompanied by the mandatory $85 filing fee. However, neither case was docketed, assigned, or scheduled for review. By contrast, Plaintiff's husband, Skanda Vishnu Sundar, filed a nearly identical HRO petition against Lee on the same day. His petition was promptly docketed, granted ex parte, and scheduled for a hearing—despite the fact that he neither requested nor qualified for a fee waiver, which was nonetheless granted without explanation. (See Exhibit J1-J3)

Although Sundar's petition was granted upon filing, it was the petitioner—Lee—who later requested that the matter proceed to a contested hearing. (See Exhibit K2)

**On March 18, 2025,** Plaintiff received a deficiency notice from the Ramsey County District Court stating that the filing fee for her petition was $300 and instructing her to either remit payment or submit a fee waiver request. The notice made no mention of any "frivolous" designation and instead confirmed that the matter was still pending action by the court. This directly contradicts any retroactive claim that the petition had already been dismissed or procedurally closed. (See Exhibit M2)

Moreover, Minn. Stat. § 609.748, subd. 3a provides that "[t]he filing fees for a restraining order under this section are waived for the petitioner and the respondent if the petition alleges acts that would constitute a violation of section 609.749, subdivision 2, 3, 4, or 5, or sections 609.342 to 609.3451." Plaintiff's petition alleged harassment that—if accepted as true—would have met the threshold for waiver under this statute. The court's failure to acknowledge or apply this waiver provision further supports Plaintiff's claims of unequal treatment and selective procedural obstruction.

**On April 3, 2025,** a hearing was held on Mr. Sundar's Harassment Restraining Order petition, which was resolved through mediation. The resulting order denied the HRO but included specific provisions prohibiting the Respondent from contacting Mr. Sundar's employer or directing third parties to do so.

Following entry of that order, Petitioner Madeline Lee filed a retaliatory motion accusing Mr. Sundar of "harassing" her by submitting the HRO petition. Her filing omitted that the matter had been resolved through mediation—at her own request—and that Mr. Sundar had explicitly pursued a non-adversarial resolution to avoid harming her. The motion further failed to acknowledge that Mr. Sundar's petition was based on documented harm to his employment and immigration status resulting from Lee's own public conduct.

This escalation—filed after the mediated outcome and amid continued suppression of Plaintiff's parallel filings—highlights the retaliatory nature of Lee's actions and the selective, inconsistent treatment applied to Plaintiff and her household. (See Exhibit O2)

**On April 11, 2025,** the court issued two conflicting orders in Plaintiff's matter. The first order granted Plaintiff's fee waiver, acknowledging her financial and procedural eligibility. Later that same day, however, the court issued a second order denying Plaintiff's March 6 Motion to Rescind the HRO. That denial relied on the demonstrably false assertion that Plaintiff had been served by mail on November 7, 2024—despite the fact that formal service was not completed until February 27, 2025 by Deputy David Sheets of the Maricopa County Sheriff's Office. The court disregarded all sworn affidavits of non-

service, all returned mail, and the governing timeline under Minn. Stat. § 609.748, subd. 3. (See Exhibit M2-M3)

Throughout this period, Plaintiff was repeatedly dismissed by court staff and instructed simply to "get a lawyer," with no regard for her disability status or her statutory right to accommodation under federal law. Requests for help or clarification were met with sarcasm, hostility, or disregard. One staff member identifying herself as "Nikki" admitted prior knowledge of Plaintiff, mocked her, and denied her procedural access in a manner that triggered panic responses related to PTSD and Autism. When Plaintiff later attempted to file a complaint about the interaction, she was told no such person worked in that role. (See Exhibit S)

Plaintiff later determined that "Nikki" was likely Nicole Rueger, a court administrator who then directly communicated with Plaintiff in later record access matters. Despite Plaintiff's disclosures of permanent disability—including PTSD, Autism, and Bipolar Disorder—and her explicit ADA accommodation requests, no interactive process was initiated. Court staff, including Rueger, Hannah Thurmes, and ADA liaison Jill Ramaker, failed to offer alternative access methods or meaningful resolution. Plaintiff's requests were either ignored, mischaracterized, or summarily denied.

**On April 11, 2025,** Referee Rebecca Rossow denied the Motion to Rescind relying on a conclusory finding that Plaintiff had been "served by mail" on November 7, 2024. The order failed to acknowledge the multiple sworn affidavits of non-service, returned mail notices, and other documentation already in the record. It also failed to identify any valid service event, delivery confirmation, or statutory basis for assuming Plaintiff received the documents. (See Exhibit M4)

**On April 16, 2025,** Plaintiff submitted a formal records request to the Ramsey County District Court seeking comprehensive documentation for multiple active case files, including 62-HR-CV-24-963, 62-HR-CV-25-299, and 62-HR-CV-25-300. The request was specific, timely, and made in good faith. Court staff member Hannah Thurmes initially responded with limited guidance. Within hours, however,

16

Judicial Court Operations Supervisor Nicole Rueger inserted herself into the correspondence and assumed unilateral control of the communication. (See Exhibit N1)

Rueger provided 14 documents and omitted a substantial number of explicitly requested materials, and failed to include an index, inventory, or legal explanation for the selective production. One of these documents was later discovered to have been altered by the addition of a judicial signature.

**On April 17, 2025,** Plaintiff filed a Motion to Vacate the Harassment Restraining Order issued against her in December 2024. The court promptly granted a hearing on that motion, scheduled for May 23, 2025. The acceptance of this motion validated the timeliness and substantive merits of Plaintiff's original March 6 motion and implicitly acknowledged that the prior April 11 denial—based on false assumptions of mail service—had been procedurally defective. (See Exhibit Q1)

**On April 18, 2025,** Rueger issued a records denial that exceeded boilerplate language and offered discretionary justifications for restricting access. At the time of this correspondence, Rueger had not been named in any litigation. Her unsolicited rationale and administrative gatekeeping—absent legal necessity or external oversight—demonstrate that the obstructive behavior at issue was not reactive or isolated, but institutional and preexisting. (See Exhibit N1)

The same week, Rueger also intervened in Plaintiff's attempt to submit a separate Harassment Restraining Order (HRO) petition, contacting Plaintiff directly and asserting that the filing had been "submitted incorrectly," despite the eFile system reflecting acceptance. This series of interferences reinforced a pattern of administrative hostility, misuse of discretionary authority, and selective obstruction—all of which support Plaintiff's Monell claim that senior court staff engaged in unconstitutional practices not dictated by statute and shielded from meaningful review.

**IV: 4. NARRATIVE ESCALATION AND DEFAMATION BY LEE**

17

**On April 21, 2025,** Plaintiff submitted a formal ADA accommodation request asking that all non-essential court communication be conducted via email rather than telephone. This request was prompted by repeated, distressing interactions with court staff—particularly Nicole Rueger—whose dismissive, mocking, and adversarial behavior had triggered panic responses and communication shutdowns consistent with Plaintiff's disabilities, including PTSD and Autism. Plaintiff did not request to receive legal filings or court notices by email—only that staff cease placing phone calls and instead use email for administrative or procedural communications to prevent psychological harm and miscommunication. (See Exhibit N2)

Also **on April 21, 2025,** Petitioner Madeline Lee submitted a highly inflammatory filing to the court. In it, she claimed that Plaintiff had contacted approximately 150 people regarding Lee's personal sexual history—an assertion wholly unsupported by evidence and seemingly calculated to inflame the record and undermine Plaintiff's credibility. (See Exhibit O2)

Lee also cited Plaintiff's conciliation court case—filed March 6, 2025—as further evidence of "harassment," despite that claim being filed through lawful channels and based on clearly documented misconduct. Additionally, she accused Plaintiff of "evasion" for using a non-residential mailing address —despite Lee's own documented history of online stalking and doxxing behaviors within overlapping digital communities. In context, this appears to be part of a broader pattern of projection and retaliatory narrative inversion, wherein Lee attributes to Plaintiff the very forms of aggression and intrusion that Lee herself initiated.

This April 21 filing was submitted in direct proximity to Plaintiff's ADA accommodation request and reflects a coordinated, retaliatory attempt to pre-frame Plaintiff as vindictive, unstable, or abusive— precisely as Plaintiff was attempting to lawfully assert protected rights under federal disability law. Furthermore, in this same filing, Lee stated that Plaintiff had "publicly admitted" to calling Child Protective Services (CPS) on June 10 and July 3. This assertion was later directly contradicted by Lee's

18

own May 8, 2025 court filing, in which she claimed that Plaintiff had publicly admitted to convincing her ex-boyfriend to call CPS on those dates—thereby refuting her prior claim and casting further doubt on the credibility, consistency, and good faith basis of her court representations.

**On April 22, 2025,** Judge Kelly Olmstead issued a formal letter stating that no one at her office would communicate with Plaintiff via email. Plaintiff was instructed that any complaint must instead be submitted as a formal pleading—despite Plaintiff's known disability-related communication limitations and her ongoing ADA accommodation request for email-based interaction. This letter marked a clear institutional refusal to engage in the interactive process required under federal disability law. (See Exhibit S)

**On April 23, 2025,** the affiliated agency Bridges to Safety issued a letter claiming that they had no knowledge of anyone named "Nikki," despite Plaintiff's prior intake interaction with a woman using that name who denied her services and mocked her disability. This contradicts earlier statements made by court staff and appears to be part of a broader institutional attempt to disavow involvement and obscure internal misconduct. (See Exhibit S)

**On April 24, 2025,** ADA liaison Jill Ramaker denied Plaintiff's accommodation request. Rather than engage with the request as submitted, Ramaker mischaracterized it as a demand to receive all court filings via email, and rejected it on that basis. No interactive process was initiated. No clarification was sought. No alternative access was proposed. The denial was not rooted in Plaintiff's actual words or documented needs, but rather in a distorted version constructed by court staff. This constitutes a direct violation of the ADA's reasonable accommodation requirements and further illustrates the institutional resistance, administrative hostility, and procedural manipulation already established throughout the record. (See Exhibit P)

Also **on April 24, 2025** Plaintiff's filing for protective relief was also denied, her fee waiver was rejected, and her petition was marked "frivolous" without explanation or hearing. On April 25, 2025,

19

Plaintiff's formal request for an accelerated hearing was denied as well. Each of these actions occurred within a four-day window and cumulatively signaled that Plaintiff's efforts to protect herself, clarify records, or assert federal rights would be met with administrative rejection rather than engagement. (See Exhibit M5-M6)

This sequence of denials and dismissals—occurring days before Plaintiff turned to federal court—demonstrates not only retaliation but a deliberate strategy to frustrate Plaintiff's access to judicial relief, discourage further filings, and preemptively discredit her character and credibility through procedural designations (e.g., "frivolous"). These events collectively form the immediate pretext for Plaintiff's federal action.

In the days leading up to Plaintiff's federal filing, Ramsey County officials and affiliated administrative entities initiated a tightly compressed sequence of dismissals, denials, and institutional deflection—actions that collectively pushed Plaintiff toward federal intervention.

**On May 5, 2025,** Plaintiff received a letter from the Second Judicial District suggesting that she could obtain eFiled documents online and redirecting her to previously attempted complaint channels. The response failed to acknowledge Plaintiff's prior efforts or the barriers she had already documented, including unresolved ADA accommodation issues and repeated misdirection from court staff. (See Exhibit S)

**On May 6, 2025,** Sara P. Boeshans, Executive Secretary of the Minnesota Board on Judicial Standards, informed Plaintiff that her misconduct complaint against Ramsey County judicial officers had been improperly formatted. No assistance was offered regarding reformatting or procedural correction. The message effectively functioned as a bureaucratic deflection, closing the door without resolving the underlying grievance. (See Exhibit S)

20

**On May 7, 2025,** Plaintiff received an official order rejecting her recently submitted Motion Regarding Immediate Danger. The court stated that the motion was not a valid procedural vehicle and that it was "untimely." No hearing was scheduled, and no effort was made to engage the substantive safety concerns outlined in Plaintiff's filing. (See Exhibit Q2)

**On May 8, 2025,** Petitioner Madeline Lee submitted a retaliatory motion to the court. In it, she referred to Plaintiff's legal archive as a form of "violent litigation threat" and claimed that Plaintiff posed a danger to her, her family, and 110 employees of Ramsey County. The motion also included a materially inconsistent claim regarding past CPS reports. This filing mischaracterized protected legal expression as aggression and appeared to be timed specifically to cast Plaintiff's anticipated federal lawsuit as menacing or destabilizing—before it was even filed. The motion relied entirely on exaggeration and omitted the context of Plaintiff's legal filings, disability disclosures, and prior requests for ADA accommodations. (See Exhibit O3)

### IV: 5. PLAINTIFF'S FEDERAL FILING AND RETALIATORY RESPONSE

**On May 9, 2025,** Plaintiff's federal civil rights complaint was docketed in the United States District Court for the District of Minnesota. The complaint named six Ramsey County officials, including court administrators, judicial referees, and law enforcement personnel. It alleged a sustained pattern of due process violations, administrative obstruction, and ADA-related misconduct.

**On May 12, 2025,** attorney Kyle Manderfeld filed a Notice of Appearance in the underlying state HRO case. Public records confirm that Manderfeld had been employed by the Ramsey County Attorney's Office through late 2024—during the period when Plaintiff's Harassment Restraining Order was initiated, advanced without service, and ultimately granted in her absence. Manderfeld entered the case

21

just three days after Plaintiff filed her federal complaint naming Ramsey County as a defendant, and he did so without disclosing any potential conflict of interest or prior affiliation. (See Exhibit T)

This six-day chain of institutional dismissal, retaliatory framing, and procedural gatekeeping created the immediate pretext for Plaintiff's turn to federal court. It demonstrated not merely negligence or error, but a coordinated unwillingness to acknowledge Plaintiff's protected rights, culminating in a narrative strategy that cast her whistleblowing and self-advocacy as a threat to institutional stability.

In response to Plaintiff's emailed concern about a potential conflict of interest, attorney Kyle Manderfeld did not deny his former employment with the Ramsey County Attorney's Office. Instead, he deflected by suggesting that Plaintiff had merely referred to "Ramsey County" as a geographical reference rather than identifying it as the governmental entity named in her federal complaint. Although Plaintiff did not ask Manderfeld directly about his past affiliation, she raised the issue with senior attorney Joel LeVahn and other partners at Barna, Guzy & Steffen, Ltd., who likewise failed to acknowledge or address the apparent conflict.

**On May 14, 2025,** Plaintiff filed a formal complaint with the Minnesota Office of Lawyers Professional Responsibility, citing Manderfeld's nondisclosure and ongoing participation in a matter where his prior employment posed an ethical concern. That same day, the Minnesota Department of Human Rights issued a denial of Plaintiff's ADA inaccessibility complaint—despite extensive supporting documentation of communication barriers, denied accommodations, and procedural obstruction at multiple levels of the court system. (See Exhibit S)

### IV: 6. MAY 23 HEARING AND POST-HEARING DEPRESSION

**On May 23, 2025,** a contested hearing on Plaintiff's Motion to Vacate the Harassment Restraining Order was held in Ramsey County District Court. The presiding judicial officer was Referee Jenese

Larmouth. Although Larmouth's name had appeared on earlier court documents—including those issued during the period of obstructed filings and unresolved ADA requests—Plaintiff did not fully grasp the extent of her involvement until the hearing itself.

During the hearing, it became clear that Referee Larmouth had played a significant role in the prior procedural events underlying Plaintiff's due process and ADA claims. Despite the pendency of a federal lawsuit and Plaintiff's previously submitted accommodation requests. Larmouth offered no acknowledgment of those concerns. She made no effort to address the absence of valid service, the unlawful issuance of the HRO, or the documented failures to provide a post-service hearing. No accommodation was offered for Plaintiff's disability, nor was any recognition given to the record of procedural deprivation.

The hearing proceeded as if these systemic violations had not occurred—further reinforcing the institutional pattern of disregard, denial, and retaliatory minimization that forms the basis of Plaintiff's ongoing claims.

## IV: 7. SECOND RUEGER DUMP: DOCUMENT PRODUCTION REVEALS THE COVERUP

**On July 7, 2025,** following more than seven weeks of silence from the court after the May 23, 2025 hearing in Madeline Sally Lee v. Kellye Strickland, during which Plaintiff received no transcript, no record of filings, and no procedural notice. Plaintiff submitted a written records request to the Ramsey County District Court. The request sought a complete and certified copy of all documentation, filings, exhibits, and hearing materials associated with the case. It was addressed to the court's general administrative email channels and did not reference or address Defendant Nicole Rueger. (See Exhibit R1)

23

Although Plaintiff had, in fact, received a paper copy of the May 23 order denying her Motion to Vacate, she was unable to recall doing so at the time she submitted her July 7 records request. At the time of receipt, Plaintiff was experiencing acute psychological distress as a result of prolonged due process violations, repeated procedural obstruction, and the sustained denial of disability accommodations by Ramsey County officials. The compounding trauma triggered a dissociative PTSD response, which disrupted Plaintiff's typical documentation habits. Unlike all prior court communications, this document was not filed with her case materials and was later discovered by her spouse in an unexpected location. Plaintiff's impaired ability to recall its receipt or disposition was not due to negligence, but to the emotional and cognitive impact of sustained institutional harm.

This episode occurred during a period in which Plaintiff experienced significant emotional and psychological collapse. She made statements of suicidal ideation to close friends she had known for more than two decades—friends who expressed concern and alarm, noting that Plaintiff had never previously made such comments. These statements were not performative. They were the direct consequence of ongoing retaliation, procedural isolation, and the perception of total institutional abandonment.

Despite Plaintiff's prior written request that Defendant Nicole Rueger not contact her—due to documented incidents of mockery, obstruction, and ADA-related misconduct—Rueger personally responded to the July 7 records request.

**On July 9, 2025**, Rueger informed Plaintiff that she would be sending 56 documents across five separate emails. No index, manifest, or explanatory note was provided to clarify the contents or confirm whether the production was complete. The first email included only affidavits, with no indication of the production's structure or scope. Critically, Rueger failed to provide the requested May 23 hearing transcript or to state whether such a transcript existed. (See Exhibit R2)

24

Plaintiff asserts that the July 9 response was not merely incomplete or inadequate, but retaliatory in nature. The continued involvement of a named defendant—Nicole Rueger—in a process that should have remained administratively neutral, combined with the fragmented and disorganized method of document delivery, appears intended to overwhelm and destabilize Plaintiff rather than meaningfully inform or assist. The production lacked any manifest or certification, failed to include key documents such as the May 23 hearing transcript, and disregarded Plaintiff's ADA accommodation request by redirecting her to a phone-based point of contact.

Upon reviewing the 14 documents sent by Rueger in April and the 56 documents provided in July, Plaintiff discovered a total of 11 court orders—affecting three distinct parties: Plaintiff, her husband Skanda Vishnu Sundar, and Petitioner Madeline Lee—that had originally been issued without a judicial signature. Of these 11 orders, 7 were subsequently altered to include a signature after the fact, without any notation or disclosure of modification. These alterations were discovered only through comparative analysis of multiple document batches and were not acknowledged by the court in any docketed communication.

This discovery confirms that not only were improper orders routinely processed without required judicial signatures, but that post-hoc editing of official court records occurred, raising substantial concerns about the integrity of the case docket and the reliability of court-generated orders.

Crucially, the document dump also revealed evidence that Petitioner Madeline Lee submitted three failed fee waiver applications before her Harassment Restraining Order petition was ultimately accepted. Internal notations strongly suggest that court personnel manually reclassified her waiver status and recharacterized the petition without transparency or notice. These administrative interventions directly contradict earlier representations made to Plaintiff about the procedural integrity of Lee's filings. None of these materials had been disclosed or acknowledged in prior proceedings and were discovered only as part of this post hoc records release.

25

Plaintiff contends that both the content and the conditions of the July 9 production confirm her broader allegations of record manipulation, retaliatory obstruction, and systemic suppression of judicial transparency. The irregularities uncovered in this release support Plaintiff's claims under the Fourteenth Amendment, the ADA, and Section 504 of the Rehabilitation Act, and underscore the institutional misconduct that forms the foundation of this action.

On **July 11, 2025**, Plaintiff emailed Judge Kelly Olmstead directly to notify her of material irregularities in the underlying Harassment Restraining Order proceedings. Plaintiff expressly named Referees Elizabeth Clysdale, Jenese Larmouth, and Rebecca Rossow as individuals involved in issuing void orders—specifically citing the absence of judicial signatures and violations of service requirements. (See Exhibit S)

On **July 14, 2025**, Plaintiff submitted a second request for a hearing on her Motion to Vacate, supported by newly obtained evidence demonstrating that Ramsey County officials had knowingly authorized and enforced an HRO that was procedurally void. The motion documented two critical failures: (1) alternate service was approved to addresses already known to be invalid; and (2) the original December 12, 2024 order lacked the signature of a district judge, rendering it void ab initio.

**On July 15, 2025**, despite Plaintiff's prior communication to Judge Olmstead, Ramsey County scheduled a hearing on the Motion to Vacate and assigned Referee Jenese Larmouth—one of the named officials—to preside. The hearing was set for **August 19, 2025**, further entrenching the appearance of retaliatory entanglement and institutional self-protection, rather than impartial adjudication. (See Exhibit V)

## VI. WITNESSES AND THIRD-PARTY OBSERVATIONS

Plaintiff intends to call the following material witnesses:

26

**Deputy Kaitlyn Burt**

Merrimack County Sheriff's Department (NH)

Filed a formal affidavit of non-service. Will testify that Plaintiff was not served prior to the September–December 2024 hearings, establishing the basis for Plaintiff's Due Process claim.

---

**Deputy David Sheets**

Maricopa County Sheriff's Office (AZ)

Served Plaintiff on February 26, 2025. Will testify to Plaintiff's confusion at time of service and lack of prior knowledge of the restraining order.

---

**Deputy Corina Loya**

Ramsey County Sheriff's Office

Authored the February 4, 2025 incident report. Noted discrepancies in Plaintiff's personal information and procedural irregularities. Claimed Plaintiff may be the victim. Will testify regarding service timeline, internal records, and failure to inform Plaintiff of the HRO.

---

**Deputy John Gleason**

Ramsey County Sheriff's Office

Listed as assisting officer on the February 4 report. May confirm procedural knowledge and Plaintiff's emotional distress.

**Neil Fredericks**

Records Technician, Ramsey County Sheriff's Office

Released and processed the February 4 police report. Will authenticate report and address

inconsistencies in internal documentation.

**Nicole Rueger**

Records Supervisor, Ramsey County (Defendant)

Mocked Plaintiff during intake. Denied procedural access and ADA accommodations. Will testify to

her direct interactions with Plaintiff, as well as her role in case handling and administrative obstruction.

**Judge Kelly Olmstead**

Ramsey County District Court

Signed a letter acknowledging Plaintiff's complaints. Referred Plaintiff back to known-obstructed

systems. May testify to knowledge of institutional harm and disability-based denial of remedy.

**Jill Ramaker**

ADA Liaison, Ramsey County Court

Communicated with Plaintiff regarding accommodations. Denied ADA request without initiating an

interactive process. Will testify to procedural failures and disregard of disability law.

**Hannah Thurmes**

Court Administration, Ramsey County

Responded to Plaintiff's April 2025 records request before it was taken over by Defendant Rueger. Will testify to internal administrative routing and communication process, corroborating Plaintiff's claims of interference and ADA noncompliance.

---

**Sara P. Boeshans**

Executive Secretary, MN Board on Judicial Standards

Corresponded with Plaintiff on May 6, 2025 regarding judicial misconduct submissions. Will testify to Plaintiff's attempts to report misconduct and institutional failure to respond meaningfully.

---

**Skanda Vishnu Sundar**

Plaintiff's spouse

Will testify to Plaintiff's mental and emotional state, deterioration following the May 23 hearing, and contemporaneous statements of despair. Will confirm handling and retrieval of court-issued documents and procedural discrepancies affecting both parties' filings.

---

**Freddy Knuth**

Personal Witness

Longtime friend of Plaintiff. Will testify to Plaintiff's psychological and emotional condition following

the May 2025 hearing, and confirm that Plaintiff made unprecedented statements of suicidal ideation. Will also testify to Plaintiff's general credibility, character, and consistency over time.

---

**David Tuttle**

Longtime friend of Plaintiff

Will testify to Plaintiff's longstanding mental health stability and the impact of recent events. As a professional acquaintance and personal friend, can offer testimony on Plaintiff's reliability, reputation, and emotional deterioration in spring and summer 2025.

---

These witnesses will corroborate Plaintiff's claims that service did not occur prior to the hearing, that Plaintiff had no meaningful opportunity to contest the HRO, and that fabricated or misrepresented evidence was used to justify court intervention. They will also establish harm, administrative obstruction, and patterns of misconduct relevant to Plaintiff's claims under the U.S. Constitution and federal disability law.

---

**Institutional Pattern and Practice**

What began as an individual error was quickly institutionalized into a pattern of coordinated harm. The violations Plaintiff experienced were not isolated or accidental—they were enabled, repeated, and concealed by an interlocking network of administrative, judicial, and enforcement actors. Ramsey County routinely issues Harassment Restraining Orders for a $300 filing fee without confirming valid

legal service, relying instead on defective affidavits, returned mail, and internally manipulated records. These practices form a systemic pattern that disproportionately harms disabled and self-represented litigants. Rather than correcting these violations, court personnel and affiliated agencies closed ranks, denied accommodations, falsified timelines, and suppressed records. Plaintiff's case exposes not only repeated due process failures, but a broader, institutional cover-up designed to preserve the appearance of procedural integrity while systematically denying access to justice.

## V. INJURY AND HARM

Plaintiff is permanently and totally disabled due to severe Post-Traumatic Stress Disorder (PTSD), Bipolar Disorder, Autism Spectrum Disorder, and Idiopathic Intracranial Hypertension (IIH). She has received Social Security Disability Insurance (SSDI) benefits for nearly two decades. These diagnoses were openly disclosed in prior communications, including a cease-and-desist letter sent to the HRO petitioner and in formal records provided to Ramsey County staff.

As a result of the actions described above, Plaintiff experienced a profound collapse in her ability to function within—or trust—the legal system. She made repeated good-faith efforts to seek information, support, and clarity: calling Ramsey County court staff, Bridges to Safety, and the Minnesota Attorney General's Office. These efforts were met with deflection, misinformation, or no response at all.

The stress caused by the unconstitutional issuance and maintenance of the Harassment Restraining Order had cascading physical and psychological consequences: Plaintiff lost over 20 pounds, began losing her hair, suffered ongoing insomnia, experienced near-constant panic attacks, and endured a documented stress-induced seizure. These harms did not result from the original allegations, but from the state's refusal to acknowledge its own error, the concealment of material facts, and the prolonged obstruction of procedural access.

31

Plaintiff is not motivated by vengeance, but by a desire for repair and justice. She seeks recognition that what was done to her was not merely negligent—it was unconstitutional. What she endured was not a personal dispute, but the weaponization of government process against a disabled litigant. These harms are not abstract; they are civic, physical, and institutional.

## VI. CLAIMS FOR RELIEF

### COUNT I – Municipal Liability Under Monell v. Department of Social Services

*(42 U.S.C. § 1983 – Against Defendant Ramsey County)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), municipalities may be held liable under 42 U.S.C. § 1983 when a constitutional deprivation results from:

1. An official policy;

2. A widespread and persistent custom; or

3. A failure to train or supervise employees amounting to deliberate indifference. See also *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

**1. Official Policy and Practice**

Ramsey County, acting through its court administration, judicial officers, ADA liaisons, and clerical staff, maintained policies and formal practices that violated Plaintiff's constitutional rights, including:

32

- Issuing judicial orders—including Harassment Restraining Orders (HROs), fee waivers, and dispositive rulings—without the signature of a district judge, in contravention of state law and due process;

- Treating unsigned or ultra vires documents as valid orders for enforcement purposes;

- Proceeding with adjudications despite sworn affidavits of non-service;

- Systematically obstructing court access, hearings, and filings for disabled and pro se litigants;

- Weaponizing procedural rules to suppress filings and retaliate against ADA-related activity.

These practices constitute official policies or closely managed practices within Ramsey County.


**II. Widespread and Persistent Custom**

These were not isolated incidents but persistent and well-understood customs embedded in the County's judicial operations. The County permitted:

- Clerical and referee staff to issue rulings, including dispositive ones, without district judge oversight;

- A consistent pattern of obstructing access by disabled litigants, particularly in response to protected ADA activity;

- Manipulation of calendars, service logs, and internal records to conceal procedural misconduct.

See *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) ("custom or usage" need not be formally approved but must be widespread, permanent, and well-settled); *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996).

33

**III. Institutional Carryover via Former RCAO Attorney Kyle Manderfeld**

The custom's entrenchment is further demonstrated by its continuation through former Ramsey County Attorney's Office (RCAO) employee Kyle Manderfeld. After transitioning to private practice at Barna, Guzy & Steffen (BGS), Manderfeld:

- Relied on unsigned, void orders despite actual or constructive knowledge from his time at RCAO that such orders were procedurally and constitutionally invalid;

- Used these orders in enforcement actions against Plaintiff;

- Took no corrective action, illustrating the depth of Ramsey County's influence on private actors formerly embedded in its systems.

This evidences the breadth and persistence of the unconstitutional custom, sufficient to establish Monell liability.


**IV. Failure to Train or Supervise**

Ramsey County failed to provide training or supervisory oversight on:

- The legal obligations under the ADA, including nondiscrimination and access mandates;

- The jurisdictional limits of referee and clerical staff;

- The necessity of judicial signatures on dispositive orders.

This failure reflects deliberate indifference. See *City of Canton*, 489 U.S. at 388; *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (failure-to-train liability applies where deficiency is the moving force behind the violation).

34

**V. Private Actor Liability under Color of Law**

Attorney Kyle Manderfeld and BGS acted under color of law within the meaning of *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), by:

- Relying on procedurally void government orders with knowledge of their invalidity;

- Acting jointly with Ramsey County actors to suppress Plaintiff's rights;

- Exercising delegated public functions (e.g., court enforcement) based on invalid government action.

See also *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (private actor conspiring with judge is a state actor); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001) (entwinement).

BGS and Manderfeld enabled and perpetuated the deprivation of Plaintiff's rights, making their conduct fairly attributable to the state.


**VI. Resulting Harm**

The policies, customs, and supervisory failures described herein were the moving force and proximate cause of Plaintiff's constitutional injuries, including:

- Denial of access to the courts and procedural relief;

- Endorsement and enforcement of void judicial orders;

- Psychological, reputational, and procedural harm;

- Violations of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

- Declare Ramsey County's policies, customs, and omissions unconstitutional;

35

- Enjoin future use of unsigned judicial orders and require oversight;

- Award compensatory and punitive damages as permitted;

- Grant such other relief as the Court deems just and proper.

---

**COUNT II – Violation of Procedural Due Process**

*(42 U.S.C. § 1983 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

**\*I. Legal Standard\***

Defendants, acting under color of state law, deprived Plaintiff of her rights under the Fourteenth Amendment by issuing, maintaining, and enforcing a Harassment Restraining Order ("HRO") without valid legal service, actual or constructive notice, or a meaningful opportunity to be heard.

The Due Process Clause requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. See \*Mathews v. Eldridge\*, 424 U.S. 319, 333 (1976). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." \*Mullane v. Cent. Hanover Bank & Tr. Co.\*, 339 U.S. 306, 314 (1950); \*Dusenbery v. United States\*, 534 U.S. 161, 167–68 (2002).

**\*II. Deprivation Without Valid Service or Notice\***

As detailed in the factual background above, the Ramsey County District Court proceeded with adjudication and issuance of an HRO against Plaintiff despite conclusive evidence that no valid service

36

had occurred. Law enforcement affidavits, multiple returned mailings, and internal court documents established that Plaintiff had not been served prior to the default hearing on December 12, 2024. Nonetheless, the court falsely recorded November 7, 2024, as the service date—without any valid affidavit or return of service—and relied on this fabricated date in subsequent rulings.

Unlike *Dusenbery*, where notice was sent to verified addresses. Ramsey County knowingly authorized substitute service to locations already deemed invalid, and failed to make any effort to cure or verify the deficiency. Proceeding on the basis of known defective notice constitutes an affirmative due process violation—not mere clerical error.

### *III. Denial of Timely and Substantiated Post-Deprivation Relief*

On March 6, 2025, nine days after actual service was completed by Deputy David Sheets of the Maricopa County Sheriff's Office, Plaintiff filed a timely motion under Minn. Stat. § 609.748 to vacate the order. That motion included sworn affidavits and documentary proof of the defective service history. Nevertheless, on April 11, 2025, the Court denied Plaintiff's motion based on the same knowingly false service date, disregarding the unambiguous record to the contrary.

This denial rendered the entire proceeding constitutionally invalid. See *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is the opportunity to be heard...at a meaningful time and in a meaningful manner.").

### *IV. Pattern of Procedural Obstruction*

The denial occurred in a broader context of procedural obstruction. Plaintiff's filings were labeled "frivolous" without review, her pleadings were dismissed without hearing, and her ADA-related

37

motions were suppressed or mischaracterized. Court administrator Nicole Rueger selectively altered or rerouted filings and engaged in adversarial conduct following Plaintiff's invocation of federal rights.

## *V. Color-of-Law Participation by Private Actor*

On May 12, 2025—three days after Plaintiff filed this federal complaint—former Ramsey County prosecutor Kyle Manderfeld entered the HRO case as opposing counsel. He did so without disclosing his prior employment with the Ramsey County Attorney's Office during the period in which the void HRO was obtained. Manderfeld continued to defend the order despite actual knowledge of the underlying service failures and procedural irregularities, thereby acting under color of law. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). Plaintiff provided formal notice to Barna, Guzy & Steffen, Ltd. (BGS)—Manderfeld's firm—detailing the due process violations, his undisclosed conflict, and the falsified service record. BGS refused to conduct a conflict check or disengage. Instead, the firm ratified Manderfeld's continued participation and thereby perpetuated the denial of Plaintiff's rights.

## *VI. Resulting Constitutional Harm*

This was not a good-faith error. It was a deliberate course of conduct designed to preserve and enforce a procedurally void order, and to deny Plaintiff any meaningful opportunity for redress. This conduct violated Plaintiff's constitutional right to procedural due process. See *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (due process is violated when state actors fail to provide pre-deprivation safeguards where the risk of error is foreseeable).

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor and the following relief:

38

- A declaration that Defendants' conduct—including that of Barna, Guzy & Steffen, Ltd.—violated her procedural due process rights under the Fourteenth Amendment;

- An order vacating the Harassment Restraining Order entered December 12, 2024;

- Injunctive relief restraining Defendants from enforcing the void order or further obstructing redress;

- Compensatory and punitive damages;

- Costs, interest, and such further relief as the Court deems just and proper

---

**COUNT III – Denial of Access to Courts**

*(42 U.S.C. § 1983 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.


The First and Fourteenth Amendments guarantee every person the right of access to the courts, including the ability to file claims, receive meaningful review, and obtain adjudication free from arbitrary obstruction or retaliatory interference. See *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Christopher v. Harbury*, 536 U.S. 403, 413–15 (2002).

Defendants, acting under color of state law, systematically denied Plaintiff this right through intentional suppression, selective enforcement, and coordinated procedural obstruction, as detailed in the factual background above.


**I. Suppression of Valid Claims**

On March 6, 2025, Plaintiff filed a valid Conciliation Court complaint against Madeline Lee for

39

defamation and harassment, paying the required $85 fee. The case was not docketed, assigned, or scheduled. No rejection notice was issued; the filing was effectively buried.

That same day, Plaintiff filed two Harassment Restraining Order (HRO) petitions—one on her own behalf, and one on behalf of her spouse. Both were substantively similar and submitted the same day.

- Plaintiff's spouse received an automatic fee waiver, ex parte order, and expedited judicial review—despite not requesting the waiver.

- Plaintiff was denied a waiver, and her petition was procedurally discarded without adjudication.

This unexplained disparity demonstrates arbitrary and discriminatory treatment in violation of Plaintiff's right of access.

**II. Obstruction of Timely and Substantiated Motions**

Plaintiff filed a timely Motion to Rescind the HRO issued against her under Minn. Stat. § 609.748. The motion was supported by sworn affidavits and documentary evidence confirming lack of valid legal service.

Nevertheless, the motion was delayed due to false waiver denials and was summarily rejected on April 11, 2025, based on a fabricated service date—despite clear contradictory documentation already in the court record.

The denial of a legally sufficient and timely motion—without hearing or engagement with the evidence—constitutes an unconstitutional obstruction of judicial access.

**III. Systemic and Retaliatory Obstruction**

Plaintiff submitted numerous additional filings, including:

- Notices of procedural misconduct;

40

- Emergency motions concerning imminent harm;

- Formal ADA accommodation requests.

Many were marked "untimely" despite timely submission, dismissed as "improper" without appeal or opportunity to cure, or outright ignored. See *Lewis v. Casey*, 518 U.S. at 351 (access-to-courts violations require actual denial of meaningful access).

This pattern of obstruction was not merely administrative negligence—it reflects a deliberate, retaliatory strategy of exclusion targeting a disabled pro se litigant engaged in protected oversight activity.

**IV. Retaliatory Motive and Protected Activity**

Procedural interference escalated in direct response to Plaintiff's protected conduct, including:

- Submitting complaints regarding internal misconduct;

- Requesting accommodations under the Americans with Disabilities Act (ADA); and

- Filing this federal lawsuit.

As Plaintiff attempted to assert her rights, her filings were increasingly blocked—while filings by the opposing party were processed and enforced without delay or valid service.

This disparity in treatment, exercised under color of administrative discretion, had the intent and effect of foreclosing Plaintiff's right to relief. See *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (access to courts is a fundamental right, especially for individuals with disabilities).

By obstructing Plaintiff's ability to participate in proceedings and secure meaningful review, Defendants denied access to the courts in violation of clearly established constitutional rights. See *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002).

41

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- A declaration that Defendants' conduct violated her constitutional right of access to the courts;

- An order directing the docketing and review of all improperly suppressed filings;

- An injunction mandating equal procedural access for future filings and hearings;

- Compensatory and punitive damages;

- Costs, interest, and such further relief as this Court deems just and proper.

---

**COUNT IV – Color of Law Misconduct**

*(42 U.S.C. § 1983 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under 42 U.S.C. § 1983, it is unlawful for any person acting under color of state law to deprive another of rights, privileges, or immunities secured by the Constitution or federal law. See *West v. Atkins*, 487 U.S. 42, 49 (1988); *Monroe v. Pape*, 365 U.S. 167, 172 (1961).

Defendants—including judicial officers, court administrators, law enforcement personnel, and private actors—acted under color of state law in issuing, enforcing, and refusing to correct a Harassment Restraining Order ("HRO") that was obtained in violation of Plaintiff's rights under the Fourteenth Amendment.

**I. State Actor Misconduct**

42

The HRO issued on December 12, 2024, was entered without legal service, without actual or constructive notice, and without a hearing. These defects were evident from:

- Two sworn affidavits of non-service (New Hampshire and Arizona law enforcement);

- Multiple returned certified mailings;

- The absence of any valid proof of service.

Nonetheless, Ramsey County proceeded without jurisdiction to adjudicate the matter and later falsely claimed that Plaintiff was served on November 7, 2024—a fabrication contradicted by court records and later corrected by valid service on February 26, 2025.

After being served, Plaintiff timely moved to rescind the HRO. The motion was denied based on the same false service date and in disregard of conclusive documentation.

Court administrator Nicole Rueger acted under color of law by:

- Interfering with filings and blocking access to court records;

- Providing false or misleading procedural guidance;

- Refusing to properly forward ADA accommodations;

- Referencing Plaintiff's emotional state in internal decisions to discredit her.

These were not clerical errors but adversarial acts cloaked in official authority to suppress a pro se, disabled litigant. Judicial officers further entrenched the violations by:

- Disregarding official affidavits in favor of internal claims;

- Denying Plaintiff access to hearings and adjudicating based on false timelines;

- Enforcing an order entered without jurisdiction.

See *Dennis v. Sparks*, 449 U.S. 24, 28 (1980) (private and public actors may jointly deprive constitutional rights); *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974) (public officials are liable when acting outside constitutional bounds).

43

**II. Private Actor Misconduct Under Color of Law: Kyle Manderfeld and Barna, Guzy & Steffen, Ltd.**

On May 12, 2025—three days after Plaintiff filed this federal lawsuit—former Ramsey County Attorney's Office employee Kyle Manderfeld entered the HRO case as opposing counsel, without disclosing his prior government employment.

As counsel at Barna, Guzy & Steffen, Ltd. (BGS), Manderfeld:

- Litigated and enforced a facially void order issued without judicial signature or valid service;

- Took no action to correct or clarify the record, despite actual knowledge of the defects;

- Refused to perform a conflict-of-interest check despite Plaintiff's formal request.

Plaintiff notified at least fourteen attorneys at BGS, including senior partners, of the prior government conflict. BGS took no corrective action. Instead, it ratified Manderfeld's involvement and allowed firm resources to support the continued enforcement of an unconstitutional order. This firm-level participation constitutes private action under color of law.

See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (private party acts under color of law when invoking state procedures to effect deprivation); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (private individuals who conspire with state officials act under color of law); cf. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (noting that private entities may be liable under §1983 when performing functions attributable to the state).

By invoking judicial authority, continuing participation after actual notice of constitutional violations, and disregarding their ethical duty to disengage, Manderfeld and BGS acted under color of law within the meaning of 42 U.S.C. §1983.

44

**III. Coordinated Color-of-Law Retaliation**

These actions were not the result of administrative error but a coordinated pattern of constitutional misconduct. Defendants:

- Retaliated against Plaintiff's exercise of First and Fourteenth Amendment rights;

- Abused legal process to suppress redress efforts;

- Reinforced unlawful state conduct through public–private entwinement.

Each named Defendant either participated directly or knowingly facilitated conduct that deprived Plaintiff of her protected rights under color of law.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- A declaration that Defendants—including Barna, Guzy & Steffen, Ltd.—acted under color of law to deprive Plaintiff of her constitutional rights;

- An award of compensatory and punitive damages as allowed by law;

- Attorneys' fees and litigation costs, if applicable;

- Any additional relief this Court deems just and proper.

---

**COUNT V – Violation of Title II of the Americans with Disabilities Act**

*(42 U.S.C. § 1983 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132:

"No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

45

subjected to discrimination by any such entity."

Plaintiff is a qualified individual with disabilities, including Post-Traumatic Stress Disorder (PTSD), Bipolar Disorder, Autism Spectrum Disorder, and Idiopathic Intracranial Hypertension (IIH)—conditions that substantially limit major life activities. She receives Social Security Disability Insurance (SSDI) and disclosed her disabilities in court filings, administrative correspondence, and direct communications with Ramsey County staff.

Despite actual and constructive notice of her disability status, Ramsey County and its agents:

- Failed to provide reasonable accommodations;

- Refused to initiate or participate in the interactive process;

- Actively undermined Plaintiff's access to court services.

See *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (Title II applies to court access); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1195–96 (10th Cir. 2007); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139–40 (9th Cir. 2001).


**I. Failure to Accommodate and Engage in the Interactive Process**

As detailed above, Plaintiff repeatedly notified Ramsey County personnel of her disability status and her resulting need for accessible communication and process.

On April 21, 2025, Plaintiff submitted a written ADA accommodation request asking that all non-essential court communications be handled via email rather than by telephone, due to trauma-induced panic responses stemming from past phone interactions and verbal hostility by court staff.

On April 24, 2025, ADA coordinator Jill Ramaker denied the request without initiating discussion, posing clarifying questions, or offering alternatives. Instead, she mischaracterized Plaintiff's request as a demand to receive all court filings by email—something Plaintiff had never asked. No individualized

46

assessment occurred.

This failure violated the ADA's mandate to engage in a good-faith interactive process and consider reasonable modifications to policy and practice.

See *28 C.F.R. § 35.130(b)(7)*; *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014).


**II. Discriminatory Treatment and Denial of Access to Court Services**

Plaintiff submitted multiple filings during periods of documented trauma, confusion, and hostility from staff. Many of those filings were:

- Returned without docketing;

- Summarily labeled "frivolous";

- Marked "untimely" despite timely submission.

Ramsey County staff did not acknowledge Plaintiff's disability disclosures or offer any procedural adaptations to ensure equitable access. Court administrator Nicole Rueger in particular responded with sarcasm and hostility, dismissed ADA references, and actively impeded Plaintiff's ability to understand, participate in, and navigate court services—ranging from record access to accommodation processes. See *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (Title II applies to proceedings and communications); *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) (Title II covers adverse treatment by court staff during court functions).

These actions exacerbated Plaintiff's symptoms, narrowed her access to justice, and materially impaired her ability to assert legal rights.


**III. Public Entity Liability**

Ramsey County qualifies as a public entity under 42 U.S.C. § 12131(1). Its judicial operations,

47

administrative offices, ADA liaisons, and internal procedural systems are "services, programs, or activities" subject to Title II.

The County is strictly liable for the discriminatory conduct of its officials and employees acting within the scope of their duties. See *Cohen*, 754 F.3d at 695.

By denying Plaintiff's reasonable accommodation, refusing to engage in the required interactive process, and retaliating against her for asserting rights under the ADA, Ramsey County excluded Plaintiff from equal participation in court services on the basis of disability.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- A declaration that Defendants violated Title II of the Americans with Disabilities Act;

- Injunctive relief requiring Ramsey County to implement lawful ADA procedures, staff training, and accountability mechanisms;

- Compensatory damages for emotional distress, functional impairment, and discriminatory exclusion;

- Attorneys' fees and costs under 42 U.S.C. § 12205;

- Any further relief the Court deems just and appropriate.

---

**COUNT VI – Violation of Equal Protection**

*(42 U.S.C. § 1983 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

The Equal Protection Clause of the Fourteenth Amendment guarantees that similarly situated individuals be treated alike by the state. It prohibits arbitrary, discriminatory, or retaliatory conduct by

48

officials acting under color of law. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

**I. Disparate Treatment of Identical Filings**

As detailed above, on March 6, 2025, Plaintiff and her husband each filed a Harassment Restraining Order (HRO) petition against the same individual, Madeline Sally Lee. Both petitions were substantively similar in content, timing, evidentiary basis, and legal posture.

Yet:

- Plaintiff's petition was denied without docketing, scheduling, or notice;

- Her husband's petition was granted ex parte, assigned a hearing date, and processed without delay.

Additionally:

- Plaintiff was required to submit a fee waiver request in order to respond to the HRO, while the petitioner received a waiver without scrutiny;

- Her husband received a fee waiver automatically, despite not requesting one;

- Plaintiff's filing was labeled "frivolous" without adjudication, while her husband's was processed respectfully and without obstruction.

That same day, Plaintiff filed a Conciliation Court claim against the same defendant, paying the full filing fee. The case was never docketed, assigned, or acknowledged. No rejection notice was issued.

**II. Disparate Treatment Based on Disability and Protected Activity**

Plaintiff complied fully with procedural rules and submitted all required documentation. The only relevant distinctions between her and her husband were:

49

- Plaintiff's pro se status:

- Her diagnosed disabilities (PTSD, Autism, Bipolar Disorder);

- Her formal complaints of internal misconduct; and

- Her assertion of rights under the ADA and federal due process law.

Throughout the litigation, this disparate treatment persisted. Plaintiff's motions were repeatedly dismissed or ignored, while similarly situated non-disabled or represented litigants encountered no such barriers. Her Motion to Rescind—supported by sworn documentation and timely under applicable statute—was summarily denied without substantive engagement.

See *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001) (disparate treatment based on protected status supports Equal Protection claim); *May v. Sheahan*, 375 F.3d 936, 944 (9th Cir. 2004).

**III. Pattern of Administrative Discrimination**

These disparities were not isolated incidents. They formed part of a broader institutional pattern of administrative discrimination:

- Plaintiff's filings were suppressed, reclassified, or obstructed;

- Identical or less substantiated filings by others—including the opposing party—were promptly processed and reviewed;

- Plaintiff's disability and lack of legal representation were treated as disqualifying rather than protected status.

This was not a neutral application of administrative policy. It was a selective and retaliatory misuse of discretion designed to isolate and discredit Plaintiff.

50

Represented and non-disabled litigants received timely communication, access to hearings, and procedural responsiveness. Plaintiff did not. The resulting harm was not only emotional but structural—denying Plaintiff equal protection of the law.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- A declaration that Defendants violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

- Compensatory damages for the harm caused by discriminatory treatment and procedural exclusion;

- Punitive damages as appropriate to deter further misconduct;

- All other relief the Court deems just and proper.

---

## COUNT VII – Retaliation and Interference with ADA Rights

*(42 U.S.C. § 12203 – Against All Defendants in Their Official or Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under 42 U.S.C. § 12203(a)–(b), it is unlawful for any person or entity to retaliate against, coerce, intimidate, threaten, or interfere with any individual because they:

- Oppose practices made unlawful under the ADA;

- Request or attempt to secure reasonable accommodations; or

- Participate in the enforcement of ADA-protected rights.

51

See *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998); *Roe v. Elyria Foundry Co.*, 2006 WL 3837389, at *3 (N.D. Ohio Dec. 28, 2006).

**I. Protected Status and ADA Activity**

Plaintiff is a qualified individual with disabilities, including Post-Traumatic Stress Disorder (PTSD), Bipolar Disorder, and Autism Spectrum Disorder. She receives SSDI and disclosed her disability status through formal ADA requests, court filings, and direct communications with Ramsey County staff.

On April 21, 2025, Plaintiff submitted an ADA accommodation request seeking that non-essential communications be handled via email instead of phone due to trauma-induced panic responses to telephone contact.

On April 24, 2025, ADA coordinator Jill Ramaker denied the request, falsely characterizing it as a demand for all court notices to be sent via email—an assertion Plaintiff never made. Ramaker failed to seek clarification, propose alternatives, or initiate the required interactive process.

See *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139–40 (9th Cir. 2001); *McCoy v. Tex. Dep't of Crim. Justice*, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006).

**II. Hostile Treatment and Procedural Obstruction**

Plaintiff was mocked and obstructed by a court staff member identifying herself as "Nikki," later confirmed as court administrator Nicole Rueger. Rueger's conduct was hostile and adversarial, materially impairing Plaintiff's ability to navigate the judicial process and chilling her willingness to assert ADA rights.

Examples include:

- Obstructing or delaying filings;

52

- Dismissing filings without review;

- Refusing to provide accurate procedural guidance.

Due to Ramsey County's failure to provide meaningful accommodations, Plaintiff—who experiences sensory dysregulation, executive dysfunction, and communication impairments—adapted by using subscription-based generative AI tools (including ChatGPT Pro) as cognitive accessibility aids.

These tools functioned as auxiliary aids and services under 28 C.F.R. § 35.104, and the necessity of their use underscores the systemic exclusion she faced.

**III. Retaliation Following Protected Activity**

On May 9, 2025, Plaintiff filed this federal civil rights complaint.

On May 12, 2025, former Ramsey County employee Kyle Manderfeld—who had worked there immediately preceding the period of Plaintiff's ADA-related filings—entered her underlying HRO case as opposing counsel. His appearance occurred just three days after Plaintiff's federal filing and was made without disclosure of prior government employment, despite actual knowledge of systemic ADA and procedural violations.

Plaintiff sent Manderfeld a copy of the HRO, which was facially void: it bore no district judge signature and had been entered without legal service or hearing. Manderfeld took no corrective action and instead actively defended the order.

This conduct was not neutral. It aligned with Ramsey County's prior unlawful practices and constituted post-complaint retaliation for Plaintiff's protected ADA activity. See *Selenke*, 248 F.3d at 1264; *Love*, 103 F.3d at 561.

Following his entry, procedural interference escalated:

- New filings were ignored;

- Motions were denied on fabricated procedural grounds;

- Plaintiff's legal standing and credibility were undermined.

Manderfeld's actions extended the original exclusionary conduct and deepened the discriminatory impact of Ramsey County's ADA failures.

**IV. Interference, Coercion, and Chilling Effect**

Defendants' conduct went beyond negligence. It amounted to intentional interference, coercion, and retaliation in violation of 42 U.S.C. § 12203(a)–(b). The combination of:

- Denied accommodations;

- Hostility by court staff;

- Retaliatory litigation maneuvers;

- Institutional disregard for Plaintiff's federal rights

constitutes actionable misconduct under the ADA.

As a direct result, Plaintiff experienced:

- Aggravation of PTSD and related symptoms;

- Emotional and functional deterioration;

- A diminished ability to participate in her legal proceedings.

These injuries were foreseeable and preventable, and they entitle Plaintiff to relief under federal law.

54

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- Compensatory damages for emotional distress, cognitive burden, and exclusion;

- Injunctive relief requiring ADA compliance audits, retraining of court staff, and formal procedures for accommodating disabled litigants;

- Reimbursement for necessary adaptive tools, including subscription-based accessibility technologies;

- Any other relief the Court deems just and proper.

---

**COUNT VIII – Violation of the Rehabilitation Act of 1973 (Section 504)**

*(29 U.S.C. § 794 – Against Ramsey County and All Public Entity Defendants)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), provides:

"No otherwise qualified individual with a disability in the United States... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

To state a claim, Plaintiff must show:

1. She is a qualified individual with a disability;

2. She was denied participation in or the benefits of a public program or activity;

3. The denial occurred solely by reason of disability; and

4. The program or activity receives federal financial assistance.

See *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 (9th Cir. 1999).

**I. Disability Status and Public Entity Obligation**

Plaintiff is a qualified individual with multiple disabilities, including Post-Traumatic Stress Disorder (PTSD), Bipolar Disorder, Idiopathic Intracranial Hypertension (IIH), and Autism Spectrum Disorder. She receives SSDI and disclosed her disability status in court filings, ADA requests, and direct communications with Ramsey County staff.

Ramsey County and its constituent departments—including court administration, judicial officers, and sheriff personnel—receive federal financial assistance and are subject to Section 504.

Despite this, Ramsey County:

- Denied Plaintiff meaningful access to court services;

- Ignored or mischaracterized valid accommodation requests;

- Dismissed disability disclosures and failed to modify procedures;

- Refused to engage in the interactive process or assess Plaintiff's individualized needs.

See *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020 (9th Cir. 2002).

**II. Discriminatory Exclusion Solely by Reason of Disability**

56

While similarly situated individuals—including Plaintiff's spouse—received hearings, waivers, and judicial access, Plaintiff's filings were:

- Ignored or returned;

- Summarily dismissed as "frivolous";

- Marked untimely despite timely delivery;

- Denied fee waivers without explanation.

Court officials including Nicole Rueger and ADA coordinator Jill Ramaker furthered this exclusion by:

- Providing hostile and inaccurate communication;

- Refusing assistance;

- Ignoring documented disability-related impairments.

At no point did Ramsey County initiate corrective procedures, engage in interactive discussion, or attempt to facilitate equal participation.

See *Chisolm v. McManimon*, 275 F.3d 315, 324–26 (3d Cir. 2001); *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014).


**III. Deliberate Indifference**

Ramsey County was placed on repeated actual notice of Plaintiff's disability status and accommodation needs. Nonetheless, it failed to act, failed to assess, and failed to modify procedures.

The exclusion Plaintiff suffered was not administrative error. It was the result of:

- Sustained administrative resistance;

- Hostility toward pro se disability assertions;

57

- Willful disregard of procedural equity.

This constitutes deliberate indifference sufficient for liability under Section 504.

**Resulting Harm**

As a direct result of these violations, Plaintiff:

- Was denied equal participation in court processes;

- Suffered emotional, procedural, and reputational harm;

- Was forced to bear personal costs to self-accommodate Ramsey County's failures.

These injuries occurred **solely by reason of Plaintiff's disabilities** and under a program receiving federal funds.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- Declaratory relief confirming that Defendants violated Section 504 of the Rehabilitation Act;

- Injunctive relief requiring systemic reforms, including formal disability intake procedures, communication accommodations, and training for court personnel;

- Compensatory damages for emotional distress, procedural obstruction, and exclusion;

- Attorneys' fees and costs, if applicable;

- Any further relief the Court deems just and appropriate.

---

**COUNT IX – Conspiracy to Violate Civil Rights**

*(42 U.S.C. § 1985(2) and/or (3) – Against All Defendants in Their Individual Capacities)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under 42 U.S.C. § 1985(2), it is unlawful for two or more persons to conspire to obstruct the due course of justice in any state or federal court with the intent to deny equal protection of the laws. Under 42 U.S.C. § 1985(3), it is unlawful for two or more persons to conspire to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws.

See *Haddle v. Garrison*, 525 U.S. 121, 125–27 (1998); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 (11th Cir. 2002).

**I. Pattern of Coordinated Obstruction and Retaliation**

As detailed above, Plaintiff is a disabled pro se litigant who sought judicial protection, civil rights enforcement, and accommodations under federal law. In response, Defendants—acting individually and in concert—undertook a coordinated campaign of procedural obstruction and retaliation designed to suppress her filings, punish her ADA activity, and block access to the courts.

Coordinated acts included:

- Permitting adjudication of a Harassment Restraining Order (HRO) without lawful service, in violation of Minn. Stat. § 609.748 and the Fourteenth Amendment;

- Suppression and reclassification of Plaintiff's filings by clerks, referees, and ADA personnel;

- Retaliatory denial of accommodations and access following protected activity;

59

- Entry of former Ramsey County prosecutor Kyle Manderfeld into the HRO case on May 12, 2025—three days after Plaintiff's federal complaint was filed;

- Coordination between Manderfeld and the opposing party, whose retaliatory motion on May 8, 2025, directly referenced Plaintiff's civil rights filing;

- Selective denial of Plaintiff's motions while providing relief to similarly situated individuals, including her spouse.

These acts were not isolated. They reflected a shared intent to chill Plaintiff's legal assertions and preserve institutional control over a disabled litigant asserting rights under federal law.

**II. Unlawful Objectives and Class-Based Animus**

The conspiracy was driven by a coordinated desire to:

- Conceal procedural and constitutional violations;

- Retaliate against Plaintiff's whistleblowing and ADA engagement;

- Shield Ramsey County personnel from legal scrutiny and exposure.

The conspirators acted with class-based animus toward Plaintiff's disability status, cognitive profile, and pro se identity. Courts interpreting § 1985(3)'s "class-based animus" requirement have recognized that animus toward disabled persons may qualify. See *Browder v. Tipton*, 630 F.2d 1149, 1152–53 (6th Cir. 1980) (holding that disabled persons may constitute a class under § 1985(3)); *Keating v. Carey*, 706 F.2d 377, 386 (2d Cir. 1983) (conspiracy against disabled Medicaid recipients actionable under § 1985(3)); see also *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340, 346 (5th Cir. 1981) (intentional exclusion from procedural protection is sufficient under § 1985).

60

The acts alleged demonstrate not only discriminatory effect but a retaliatory motive to isolate and discredit Plaintiff for engaging in ADA-protected activity and exposing institutional misconduct.

**III. Resulting Harm**

As a direct and foreseeable result of this conspiracy, Plaintiff suffered:

- Reputational and emotional injury;

- Escalation of PTSD and panic disorder symptoms;

- Loss of legal standing, access to remedy, and procedural protection;

- Continued enforcement of an ultra vires, procedurally defective order designed to silence her.

Defendants' collective actions, under color of state law and coordinated in both timing and substance, violated 42 U.S.C. § 1985(2) and/or (3) and are actionable under federal civil rights law.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- Declaratory relief finding that Defendants conspired to violate her civil rights under 42 U.S.C. § 1985(2) and/or (3);

-  Compensatory and punitive damages against all individual Defendants who participated in the conspiracy;

- Injunctive relief prohibiting further retaliation or procedural obstruction;

- Any other relief the Court deems just and proper.

61

**COUNT X – Abuse of Process**

*(Common Law – Against All Individual Defendants)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under Minnesota law, abuse of process is the misuse of legal proceedings for a purpose other than that for which the process was designed—particularly to intimidate, harass, or punish a party engaged in lawful conduct.

See *Dunham v. Roer*, 708 N.W.2d 552, 571 (Minn. Ct. App. 2006).

**I. Ulterior Use of Judicial Process**

Defendants misused judicial procedures to retaliate against Plaintiff for her exercise of protected rights, including disability advocacy, mandated reporting, and federal civil rights activity.

This included:

- Procuring a Harassment Restraining Order (HRO) based on false, retaliatory claims stemming from Plaintiff's lawful child protection report;

- Advancing that HRO through knowingly defective service, including outdated addresses and no corrective action despite actual knowledge;

- Blocking Plaintiff's statutory right to contest the HRO after valid service, by inventing service dates, misrepresenting the record, and denying access to hearings;

- Misusing protective order statutes and court filings to criminalize Plaintiff's ADA activity and federal legal filings;

62

- Weaponizing motion practice—for example, the May 8, 2025 filing that labeled Plaintiff's civil rights lawsuit a "violent threat"—to poison the judicial record and suppress legitimate advocacy.

These acts constitute misuse of legal process with retaliatory and chilling intent.

See *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987); *Waldron v. Roark*, 292 N.W.2d 102, 104 (Minn. 1980).

**II. Resulting Harm**

Defendants did not pursue the challenged process for legitimate legal redress, but instead:

- Targeted and discredited a vulnerable litigant exposing institutional misconduct;

- Exploited court mechanisms to chill speech and advocacy;

- Obstructed Plaintiff's access to judicial remedy and fair treatment.

As a direct result, Plaintiff experienced:

- Public stigma and reputational harm;

- Suppression of protected speech and procedural access;

- Loss of standing and equitable relief;

- Severe psychological harm, including exacerbation of PTSD and panic disorder.

This conduct violates the boundaries of ethical litigation and is actionable under Minnesota common law.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

63

- Compensatory damages for harm caused by the misuse of legal process;

- Punitive damages against individual Defendants whose conduct was willful or malicious;

- Declaratory relief recognizing the abuse of judicial process;

- Any other relief the Court deems just and equitable.

---

**COUNT XI – Violation of the Minnesota Constitution: Article I, §§ 3, 6, 8, 10**

*(Against All Defendants in Their Individual or Official Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

The Minnesota Constitution guarantees civil liberties that are coextensive with—and in some respects more protective than—those under the U.S. Constitution. Defendants, acting under color of law, violated multiple provisions of the Minnesota Bill of Rights, causing Plaintiff substantial harm.

**Article I, §3 – Freedom of Speech and Expression**

"Every person may freely speak, write and publish his sentiments on all subjects…"

Plaintiff was penalized for engaging in constitutionally protected expression, including:

- Maintaining a public legal archive;

- Filing federal civil rights complaints and pleadings;

- Submitting a report to Child Protective Services;

- Advocating for disability rights and public accountability.

Defendants mischaracterized this expression as threatening or abusive. A May 8, 2025 court filing explicitly cited Plaintiff's civil rights activity as "evidence" of dangerous conduct, demonstrating

64

viewpoint-based retaliation in violation of Article I, §3.

See *State v. Turner*, 864 N.W.2d 204, 208 (Minn. Ct. App. 2015); *In re Welfare of A.J.B.*, 929 N.W.2d 840, 848 (Minn. 2019).

**Article I, §6 – Right to Access and Remedy**

"Every person is entitled to a certain remedy in the laws for all injuries or wrongs…"

Plaintiff was denied meaningful access to Minnesota courts through:

- Suppression and reclassification of filings;

- Arbitrary denial of fee waivers;

- Unequal procedural treatment compared to similarly situated parties, including her spouse.

Despite full procedural compliance. Plaintiff's filings were dismissed, blocked, or ignored without justification—denying her the "certain remedy" guaranteed under Minnesota law.

See *Humenansky v. Minn. Bd. of Med. Exam'rs*, 525 N.W.2d 559, 564 (Minn. Ct. App. 1994).

**Article I, §8 – Due Process of Law**

"No person shall be held to answer for a criminal offense without due process of law…"

Plaintiff was subjected to a Harassment Restraining Order (HRO) that:

- Was issued without lawful service;

- Proceeded in spite of two sworn affidavits of non-service;

- Relied on fabricated service entries and deprived Plaintiff of her right to be heard.

This constitutes a direct violation of the procedural protections guaranteed by Article I, §8.

See *Mattson v. Flynn*, 216 N.W.2d 542, 544 (Minn. 1974).

**Article I, §10 – Right to Privacy and Freedom from Unreasonable Search and Seizure**

"The right of the people to be secure in their persons, houses, papers, and effects…"

65

Ramsey County disclosed Plaintiff's confidential home address—designated for protective use only—to a known harasser in the context of an HRO proceeding. This occurred:

- Despite a verified safe address on file;

- In a proceeding where no lawful service had occurred;

- In a manner that materially endangered Plaintiff's safety.

The disclosure was unnecessary, harmful, and violated Plaintiff's right to privacy and security under Article I, § 10.

See *State v. Askerooth*, 681 N.W.2d 353, 361 (Minn. 2004); *In re Welfare of J.M.*, Jr., 574 N.W.2d 717, 723 (Minn. 1998).


**Systemic and Retaliatory Pattern**

- These violations were not isolated:

- They were coordinated, prolonged, and retaliatory;

- They were carried out with actual notice of harm and formal requests for redress;

- They reflect a systemic abuse of state power against a disabled litigant seeking lawful remedy.

- These acts give rise to independent, justiciable claims under the Minnesota Constitution, for which Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

- Declare that her rights under Article I, §§ 3, 6, 8, and 10 of the Minnesota Constitution were violated;

- Award compensatory and punitive damages against all individual Defendants, as appropriate;

- Grant injunctive and equitable relief to prevent further harm;

- Order any additional relief the Court deems just and proper.

66

**COUNT XII – Intentional Infliction of Emotional Distress (IIED)**

*(Minnesota Common Law – Against All Defendants in Their Individual Capacities as Applicable)*

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under Minnesota law, a claim for Intentional Infliction of Emotional Distress (IIED) requires:

Extreme and outrageous conduct;

- Performed intentionally or with reckless disregard;

- That causes emotional distress;

- Of a severity that no reasonable person could be expected to endure.

See *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983); *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. Ct. App. 2003).

**I. Extreme and Outrageous Conduct by State Actors**

Defendants—acting under color of law and with full knowledge of Plaintiff's disability and psychological vulnerability—engaged in a sustained pattern of retaliatory, stigmatizing, and procedurally manipulative conduct that goes far beyond mere administrative error or neglect.

Defendants' conduct was:

- Deliberate, not accidental;

- Targeted, not incidental;

- Systemic, not isolated.

Specific acts include:

- Maintaining and enforcing a facially void HRO, despite sworn affidavits of non-service and repeated warnings of legal and psychological harm;

67

- Obstructing or rerouting Plaintiff's filings, ignoring ADA requests for accommodation and treating her disability-related confusion as grounds for exclusion;

- Mocking and delegitimizing Plaintiff's cognitive state in internal court records, referring to her as "confused" or "frivolous" while denying her procedural access;

- Escalating proceedings during known episodes of psychological crisis, including after direct warnings of suicidal ideation and dissociation;

- Retaliating against Plaintiff's protected ADA activity, transforming civil rights assertions into grounds for punishment.

This conduct was reckless at best and malicious at worst. It exploited Plaintiff's vulnerability, abused the state's authority, and reflects an institutional effort to isolate and destabilize her. It exceeds all bounds of decency and would be utterly intolerable in a civilized society.

See *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990) (malice defeats immunity); *Parrish v. Bd. of Educ.*, 122 F. Supp. 3d 1081, 1103 (D. Minn. 2015) (IIED supported by evidence of disability-based retaliation and systemic exclusion).


**II. Severe Emotional Distress and Foreseeable Harm**

This was not transient stress. The emotional distress was:

- Severe, documented, and medically corroborated;

- Directly caused by the specific acts described above;

- Foreseeable to every Defendant with access to Plaintiff's ADA records and crisis disclosures.

Plaintiff experienced:

- Suicidal ideation, dissociation, and long-term psychological destabilization;

- Inability to reliably work, parent, or function due to court-imposed trauma;

- Repeated panic episodes linked directly to triggering court actions and procedural barriers.

These outcomes were:

- Reported in real-time to ADA liaisons and court personnel;

- Described in contemporaneous filings, emails, and formal requests;

- Confirmed by third-party witnesses and medical records.

Defendants had actual knowledge of Plaintiff's condition and continued to act in ways calculated—or at minimum foreseeably likely—to cause acute psychological harm. They did so while holding state-backed authority over her civil rights, legal standing, and daily survival.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor on this Count, including:

- Compensatory damages for pain, suffering, and psychological harm;

- Punitive damages to deter future misconduct of this nature;

- Any other relief the Court deems just and equitable.

COUNT XIII – False Light and State-Enabled Defamation

(Minnesota Common Law and 42 U.S.C. § 1983 – Against Ramsey County and Supervisory Officials)

Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

Under Minnesota common law, false light publicity occurs when one gives publicity to a matter that places another before the public in a false light that would be highly offensive to a reasonable person, and does so with knowledge or reckless disregard for its falsity.

See *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998); *Restatement (Second) of Torts* § 652E (1977).

69

Separately, under 42 U.S.C. § 1983, a constitutional claim may arise where reputational harm is inflicted under color of state law in a manner that impairs a protected liberty interest without due process. This includes situations in which government officials endorse, perpetuate, or fail to correct stigmatizing falsehoods—especially where the falsehood is tied to legal status or access to rights. See *Paul v. Davis*, 424 U.S. 693, 710–12 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Doe v. Dep't of Pub. Safety*, 710 N.W.2d 214, 234 (Minn. Ct. App. 2006).

## I. State-Enabled False Narratives and Institutional Silence

Defendants, under color of law, issued, maintained, and refused to correct a Harassment Restraining Order (HRO) that was facially void for lack of service and jurisdiction. In doing so, they knowingly enabled and perpetuated false and defamatory public labeling of Plaintiff as dangerous and threatening.

Despite actual knowledge that:

- Service of process had not been effectuated;

- Two sworn affidavits of non-service had been filed;

- The HRO lacked jurisdictional validity and legal effect—

Defendants:

- Took no corrective action despite multiple opportunities;

- Allowed the void order to remain "active" in public records, with no notation of its procedural defect;

- Obstructed Plaintiff's motions to vacate, suppressing her ability to contest the narrative;

- Ignored repeated formal warnings of reputational and physical harm arising from the court's inaction.

70

## II. Foreseeable Reputational Harm and Third-Party Amplification

By leaving the order publicly accessible and uncorrected, Defendants foreseeably enabled third-party actors to weaponize it:

- Petitioner Madeline Lee publicly described Plaintiff as dangerous and sexually threatening, citing the HRO alone as justification;

- Online actors engaged in targeted harassment, including doxing, stalking, death threats and posting defamatory content;

- These narratives were amplified across social media, causing substantial reputational and emotional harm to Plaintiff;

- The continued "active" status of the HRO, visible in Minnesota court records, operated as a de facto government endorsement of the false claims.

Plaintiff was a known digital creator at the time. Defendants were placed on actual notice—through formal filings, ADA requests, and public communications—that their silence was contributing to reputational harm. Their failure to act in the face of that danger makes them liable not only for defamation, but for state-enabled stigmatization.

## III. Constitutional Injury and Stigma-Plus Harm Under § 1983

The combination of public reputational harm and the maintenance of a procedurally void judicial order resulted in a "stigma-plus" constitutional violation under *Paul v. Davis*.

Defendants, acting under color of law:

- Deprived Plaintiff of the ability to contest and clear her name;

- Denied her procedural due process while maintaining an injurious government record;

71

- Imposed reputational damage with legal and social consequences.

This constitutes a violation of Plaintiff's liberty interest under both the Minnesota Constitution and the Fourteenth Amendment. See *Constantineau*, 400 U.S. at 437 ("official defamation" requires procedural safeguards); *Paul*, 424 U.S. at 710 (stigma combined with legal deprivation gives rise to constitutional claim).

Plaintiff's injuries were contemporaneously documented, corroborated by third-party witnesses, and materially worsened by the institutional refusal to act.

**WHEREFORE, Plaintiff respectfully requests judgment in her favor on this Count, including:**

- Compensatory damages for reputational, emotional, and economic harm;

- Punitive damages to deter future official misconduct and institutional silence;

- Any other relief the Court deems just and proper.

---

**VII. PRAYER FOR RELIEF**

**\*\*WHEREFORE\*\***

Plaintiff respectfully demands that this Court enter judgment in her favor and grant the following relief:

**1. Declaratory Relief**

A judicial declaration that Defendants—individually and in their official capacities—violated

- Plaintiff's rights under:

- The United States Constitution;

72

- Title II of the Americans with Disabilities Act (42 U.S.C. § 12132); and

- Section 504 of the Rehabilitation Act (29 U.S.C. § 794),

through a sustained campaign of discrimination, obstruction, and retaliatory misconduct.

---

## 2. Injunctive Relief

A permanent injunction directing Ramsey County and its agents to:

- Vacate the Harassment Restraining Order issued on December 12, 2024, as void ab initio for lack of jurisdiction and defective service;

- Cease and desist from all further acts of retaliation or selective enforcement against Plaintiff, including but not limited to suppression of filings, denial of accommodations, and tampering with procedural access;

- Implement enforceable policies to ensure that disabled and pro se litigants are granted the full protections of federal and state law—including equitable access to court filings, ADA accommodations, official records, and responsive process.

---

## 3. Compensatory Damages

Plaintiff seeks an award of compensatory damages in an amount to be determined at trial, reflecting the scope, duration, and compounded effect of the constitutional and statutory violations alleged herein. These damages include, but are not limited to:

- Severe and sustained psychological distress, including exacerbation of trauma symptoms directly resulting from prolonged denial of due process and disability accommodations;

- Documented neurological deterioration, including stress-induced seizure activity and functional impairment linked to discriminatory exclusion from legal access;

73

- Reputational harm, including the chilling of speech, loss of professional opportunities, and exposure to targeted harassment following the issuance of a void restraining order;

- Economic loss and resource depletion, including uncompensated labor, litigation-related expenses, and diversion of time required to compensate for institutional obstruction;

- Loss of autonomy and cognitive strain, resulting from the need to navigate and survive hostile systems without support, while managing disability-related limitations;

- The cumulative toll of being denied meaningful access to justice, remedy, and protection by the very institutions tasked with upholding those rights.

Plaintiff reserves the right to supplement this demand with expert testimony and economic valuation as discovery progresses.

---

## 4. Punitive Damages

Plaintiff requests an award of punitive damages in an amount not less than $250,000 and not more than $750,000 per individually liable Defendant, including but not limited to:

- Nicole Rueger,

- And any other Defendant found to have acted with malice, deliberate indifference, or sustained knowledge of Plaintiff's disability status and protected rights.

These damages are not merely punitive, but necessary for deterrence and institutional accountability. Where criminal penalties are unavailable and direct oversight has failed, civil sanctions serve as the only meaningful tool to:

- Deter future rights violations;

- Compensate for the heightened vulnerability of disabled and pro se litigants;

- Signal that sustained misconduct by public officials will incur personal and professional consequences.

- This case does not involve isolated error or unintentional harm. It presents a repeatable failure mode within Ramsey County's legal infrastructure. Punitive damages are essential to prevent the normalization of such conduct across similarly situated institutions.

---

## 5. Attorney's Fees and Costs

An award of attorney's fees and litigation expenses under 42 U.S.C. § 1988, applicable retroactively should Plaintiff retain counsel at any phase of this proceeding.

In addition, Plaintiff seeks reimbursement for out-of-pocket litigation costs incurred during the preparation of this action, including subscription fees for assistive generative AI tools such as ChatGPT Pro.

- These tools functioned as:

- A form of cognitive accessibility support;

- A functional substitute for legal representation;

- A necessary adaptation caused by Defendants' failure to accommodate Plaintiff's disabilities under the ADA.

Plaintiff asserts that, where disabled litigants are denied access to traditional accommodations or representation, their use of accessible digital tools must be recognized as both:

- A legitimate and necessary litigation expense;

- A valid form of self-directed ADA compliance in response to systemic exclusion.

---

6. Additional Relief

75

Such other relief as this Court deems just, necessary, and equitable under the circumstances, including but not limited to:

- Leave to amend this Complaint as discovery reveals further wrongdoing;

- Judicial referral for independent investigation of record tampering, obstruction, or potential criminal misconduct by named Defendants.

---

## 7. Preservation of Parallel Claims

A formal judicial acknowledgment that Plaintiff withdrew her June 9, 2025 conciliation court filing without prejudice, under duress and amid retaliatory interference and venue obstruction by Ramsey County personnel.

Plaintiff expressly reserves all related tort claims—including but not limited to:

- Defamation,

- Intentional infliction of emotional distress,

- Abuse of process,

- Civil conspiracy—

for future prosecution in a lawful, neutral venue.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted,

Dated: July 23, 2025

76

/s/ Kellye Strickland

Kellye Strickland

6445 S Maple Ave, 2006

Tempe, AZ 85283

kellye.sundar@gmail.com

(603) 892-8666

Plaintiff, Pro Se

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| I. Introduction | 2 |
| II. Jurisdiction and Venue | 4 |
| III. Parties | 3 |
| IV. Factual Background | 7 |
| A. Origins of the Conflict | 7 |
| B. Unlawful Service and Hearings Without Notice | 9 |
| C. Plaintiff's Attempts to Assert Rights | 13 |
| D. Narrative Escalation and Defamation by Lee | 17 |
| E. Plaintiff's Federal Filing and Retaliatory Response | 21 |
| F. May 23 Hearing and Post-Hearing Depression | 22 |
| G. Second Rueger Dump: Document Production Reveals the Coverup | 23 |
| V. Witnesses and Third-Party Observations | 26 |
| VI. Institutional Pattern and Practice | 30 |
| VII. Injury and Harm | 31 |
| VIII. Claims for Relief | 32 |
| Count I – Monell Liability (Ramsey County) | 32 |
| Count II – Violation of Procedural Due Process | 36 |
| Count III – Denial of Access to Courts | 39 |
| Count IV – Color of Law Misconduct | 42 |
| Count V – Violation of Title II of the Americans with Disabilities Act | 45 |
| Count VI – Violation of Equal Protection | 48 |
| Count VII – Retaliation and Interference with ADA Rights | 51 |
| Count VIII – Violation of the Rehabilitation Act (Section 504) | 55 |
| Count IX – Conspiracy to Violate Civil Rights (42 U.S.C. § 1985) | 59 |
| Count X – Abuse of Process (Common Law) | 65 |
| Count XI – Violation of the Minnesota Constitution | 64 |
| Count XII – Intentional Infliction of Emotional Distress (IIED) | 67 |
| Count XIII – False Light and State-Enabled Defamation | 69 |
| IX. Prayer for Relief | 72 |
| X. Jury Demand | 76 |